UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ZUPPARDI'S APIZZA, INC.,          :
                                  :
        Plaintiff,                :
                                  :
v.                                :   Case No. 3:10-CV-01363 (RNC)
                                  :
TONY ZUPPARDI'S APIZZA, LLC       :
d/b/a TONY ZUPPARDI'S APIZZA,     :
                                  :
and                               :
                                  :
THE ESTATE OF                     :
ROBERT ZUPPARDI,                  :
                                  :
        Defendants.               :

RULING AND ORDER

This is a trademark case in which the parties have filed motions for summary judgment.  For reasons that follow, plaintiff's motion for partial summary judgment on defendants' counterclaims [ECF No. 94] is granted, and its motion for summary judgment on the issue of infringement [ECF No. 102] is denied.  Defendants' first motion for summary judgment [ECF No. 96] is granted in part and denied in part and the motion for summary judgment on count four [ECF 158] is granted.

I. Background

The trademarks at issue in this case relate to a family pizza business.  Dominick Zuppardi came to the United States in 1934, settled in West Haven, Connecticut, and opened a bakery.

In 1947 Dominick and his son, Anthony Zuppardi Sr., began serving pizza out of a shop on Union Avenue.  They called their establishment "Zuppardi's Apizza" ("Zuppardi's").  The business has since moved two doors down on Union Avenue but otherwise endures today.

Anthony Sr. and his wife, Frances, had four children.  A son, Robert, began working at Zuppardi's in the 1960s.  Though Anthony Sr. continued to have a hand in managing the business, Robert became its sole owner in 1978 and its president in 1987. Robert's sisters, Cheryl Zuppardi Pearce and Lori Zuppardi, joined him as owners in 1988.  Zuppardi's assumed its present corporate structure in 2000.  Zuppardi's Apizza, Inc. thereby acceded to all right, title, and interest of its predecessors in the marks "Zuppardi's" and "Zuppardi's Apizza," under which the business had sold pizzas since 1947.  In its corporate form, Zuppardi's continued in the two lines of business it had carried on for decades: selling fresh pizzas to customers in its Union Avenue location and selling frozen pizzas to restaurants and shops in southern Connecticut.

The present dispute can be traced to 2002, when Robert's poor health compelled him to reduce his role at the restaurant. By 2005 he stopped working at Zuppardi's altogether.  In 2008, his sisters bought his entire interest in the family business.

2

In 2005, as Robert's involvement in Zuppardi's was coming to an end, his son, Anthony Zuppardi III, who had once worked at Zuppardi's, opened a pizza parlor in Wilmington, Vermont.  He called it "Tony Zuppardi's Apizza" ("TZA").  In addition to serving customers at its Wilmington location, TZA sold frozen pizzas to restaurants and shops in Vermont, Massachusetts, and Connecticut.  Robert helped his son by soliciting business from Connecticut establishments, some of them old customers of Zuppardi's.  TZA's pizza boxes and frozen pizza labels used marks and trade dress quite similar to the ones Zuppardi's has been using since the 1940s.  That similarity is the root of this controversy.[1]

In 2007, TZA filed a trademark application for the mark "Tony Zuppardi's Apizza" and became the owner of U.S. Trademark Registration No. 3549074.  Eventually Zuppardi's filed its own applications, one for the mark "Zuppardi's Apizza" and one for the stylized mark "Zuppardi's."  The United States Patent and Trademark Office ("PTO") rejected the applications in September 2009, on the ground that the requested marks would too easily be confused with the registered TZA mark.  Three months later Zuppardi's filed a petition to cancel TZA's registered mark.  It argued that it had been serving pizza under the requested marks

---

[1] The boxes, labels and marks are reproduced in the Appendix.

since 1947.  TZA responded by surrendering its registered mark,
and the PTO granted the petition for cancellation.  As a result,
Zuppardi's now owns U.S. Trademark Registration Nos. 3888558
(for "Zuppardi's Apizza") and 3888782 (for the stylized mark
"Zuppardi's").[2]

     Despite its victory before the PTO, plaintiff filed suit
against TZA and Robert Zuppardi in August 2010.  The amended
complaint – which reflects several changes in circumstances
since 2010, including the death of Robert Zuppardi and the
cessation of TZA's business – recites four counts against TZA
and Robert Zuppardi's estate.  The first alleges trademark
infringement and unfair competition in violation of section 43
of the Lanham Act, 15 U.S.C. § 1125; the second, violation of
the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.
Stat. § 42-110a; the third, common law trademark infringement
and unfair competition; and the fourth, infringement of the
plaintiff's federally registered mark in violation of section 32
of the Lanham Act, 15 U.S.C. § 1114.  Plaintiff seeks
compensatory and punitive damages, attorneys' fees and an
injunction prohibiting TZA from further infringement.  TZA has

---

[2] Plaintiff also owns Connecticut State Registration Nos. 23328
(for the trademark "Zuppardi's Apizza") and 23329 (for the
service mark "Zuppardi's Apizza").

counterclaimed for cancellation of plaintiff's registered trademarks.

Pending for decision are four motions for summary judgment. The first, ECF No. 94, is the plaintiff's motion for summary judgment on the counterclaims.  The second, ECF No. 96, is the defendants' motion for summary judgment on all four counts based on laches.  The defendants also move for partial summary judgment on the grounds that the plaintiff cannot prove damages, plaintiff's registered marks should be cancelled, TZA enjoys common law rights in the "Tony Zuppardi's Apizza" mark in Vermont and Massachusetts, and plaintiff is not entitled to attorneys' fees.  The third motion, ECF No. 102, is the plaintiff's motion for summary judgment on the issue of trademark infringement.  Finally, in the fourth motion, ECF No. 158, TZA argues that it has not infringed the plaintiff's federally registered marks as a matter of law.

## II. <u>Discussion</u>

The Court's role on a motion for summary judgment is to determine whether the record presents triable issues of fact, not to try them.  Summary judgment is properly granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it

influences the case's outcome under governing substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In reviewing the record, the Court must view the evidence in a manner most favorable to the nonmovant, resolving all ambiguities and drawing all inferences in favor of the nonmovant. Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).

A. Plaintiff's Motion for Summary Judgment on the Counterclaims

In its answer to the amended complaint, TZA counterclaims for cancellation of the plaintiff's registered trademarks. It argues that the "Zuppardi's Apizza" and stylized "Zuppardi's" marks should never have been registered and should now be cancelled. Its argument rests on section 2(c) of the Lanham Act, 15 U.S.C. § 1052(c), which provides that "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration . . . unless it . . . [c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent . . . ." TZA argues that the registered Zuppardi's marks identify Anthony Zuppardi III, who is now living, and Robert Zuppardi, who was alive when the marks were registered.

6

Plaintiff resists this argument on four grounds.  First, it argues that Robert Zuppardi's estate lacks standing to assert a claim under § 1052(c).  Second, it urges that to the extent the counterclaim is based on the marks' identification of Robert Zuppardi, the claim does not survive his death because the statutory language refers only to "particular living individual(s)."  Next, it argues that Robert consented to registration of the marks.  Finally, it argues that neither Robert nor Anthony III was sufficiently associated with Zuppardi's Apizza to be "identif[ied]" by the marks as the term is used in § 1052(c).  I agree with regard to the last ground.

1. <u>Standing: Robert Zuppardi's Estate</u>

A party lacks standing to bring an action under § 1052(c) unless it shows, first, that it engages in commercial activity, and, second, that it will suffer damages by association with the contested trademark.  <u>Rick v. Buchansky</u>, 609 F. Supp. 1522, 1539 (S.D.N.Y. 1985); <u>Societe Civile Des Domaines Dourthe Freres & Philippe Dourthe v. S.A. Consortium Vinicole De Bordeaux Et De La Gironde</u>, 6 U.S.P.Q.2d 1205, 1207-08 (T.T.A.B. 1988).  According to the plaintiff, Robert Zuppardi never engaged in any commercial activity of his own.  He simply worked for Zuppardi's and, later, helped Anthony III at TZA.  Plaintiff argues that

Robert therefore lacked standing at the time he asserted his counterclaims and his estate lacks standing now.

The defendants do not argue that Robert engaged in the sort of commercial activity that confers standing under the two-pronged test.  Rather, they argue that, as a defendant in this action and counterclaim plaintiff, Robert's standing under § 1052(c) was "inherent."  I agree.  See Finanz St. Honore, B.V. v. Johnson & Johnson, 85 U.S.P.Q.2d 1478, 1479 (T.T.A.B. 2007) ("As a counterclaim plaintiff, [defendant] need not allege its standing to challenge the pleaded registrations because its standing is inherent.").  Standing doctrine attempts to ensure that a litigant has a legally sufficient interest in a case.  Robert Zuppardi had a sufficient stake in this case to satisfy standing requirements by virtue of his status as a defendant.

2. Survival of the Counterclaims

Plaintiff argues that even if Robert was a proper counterclaim plaintiff, his counterclaims do not survive his death.  Section 1052(c) and Conn. Gen. Stat. § 35-11b(4) both prohibit registration of a trademark that identifies a "particular living individual."  According to the plaintiff, this plain language settles the issue of survival and precludes Robert's estate from maintaining his counterclaims.  Moreover, plaintiff points out, cancelling the registered marks would

serve no useful purpose because Robert's death removes any barrier to plaintiff's registering the marks again.  TZA does not dispute this last point.

Plaintiff's argument is really two arguments, one based on principles that govern the survival of actions and the other based on standing.  With regard to the first, federal and state common law govern survival unless "a statute directly addresses the issue."  United States ex rel Colucci v. Beth Israel Med. Ctr., 603 F. Supp. 2d 677, 680 (S.D.N.Y. 2009).  That the statutes in question prohibit registration only of marks that identify "living individual[s]" does not settle the issue of survivability.  The quoted statutory language speaks to requirements concerning registration, not requirements concerning the maintenance of an action.  Because neither § 1052(c) nor Conn. Gen. Stat. § 35-11b(4) "directly addresses" survivability, the question is governed by common law. Plaintiff does not contest the defendants' argument that the counterclaims survive under common law principles.

The second part of plaintiff's argument recognizes that the limitation on the defendants' remedy – only cancellation is available as a remedy – creates an oddity.  Even if the plaintiff's registered marks are cancelled because they refer to Robert Zuppardi, plaintiff can immediately re-register them

because Robert is deceased and therefore outside the protections of § 1052(c) and § 35-11b(4).  This argument in essence raises an issue of standing: it asserts that a favorable decision will not redress the defendants' injury.

I think plaintiff's ability to re-register the marks does not entitle it to dismissal of the counterclaims for two reasons.  First, as just discussed, Robert Zuppardi's estate is a defendant in this action.  Plaintiff has alleged that Robert infringed its registered marks.  Though the estate is a plaintiff on the counterclaims, the counterclaims function in the context of the overall action as defenses to the charge of infringement.  Even though Zuppardi's can re-register its marks, the argument for cancellation nonetheless serves as a defense to claims against the estate.

Second, plaintiff's ability to re-register the marks does not vitiate the Court's power to grant defendants the relief they seek.  The counterclaims seek cancellation of U.S. Trademark Registration Nos. 3888558 and 3888782, along with Connecticut Trademark Registration Nos. 23328 and 23329.  This Court has the authority to cancel those marks.  That plaintiff would be able to re-register the marks does not deprive the estate of standing.

On this point Sprint Communications Co., L.P. v. APCC
Servs., Inc., 554 U.S. 269 (2008), is instructive.  In Sprint
Communications, assignees for collection brought suit on a debt.
An agreement with the assignor compelled them to remit to the
assignor the entire amount of their recovery.  Sprint
Communications, 554 U.S. at 287.  The defendant argued that the
assignees lacked standing because a favorable decision would not
redress any injury they suffered: the assignees would simply
turn over the money as required by their agreement.  The Court
held otherwise.  "What does it matter," asked the majority,
"what the [assignees] do with the money afterward?  The injuries
would be redressed whether the [assignees] remit the litigation
proceeds . . . donate them to charity, or use them to build new
corporate headquarters."  Id.

In Sprint Communications, the plaintiffs had no legal right
to retain (or even to control the disposition of) their
recovery.  Here the defendants' relief is subject to plaintiff's
right to re-register its marks.  I read Sprint Communications to
stand for the proposition that in the redressability inquiry, a
court's horizon-line should be its own disposition of the case.
Because this Court has the authority to cancel the marks that
the defendants claim were improperly registered, the
requirements of standing are satisfied.

11

3. <u>Consent</u>

Plaintiff next argues that Robert Zuppardi consented to registration of the marks.  It supports this argument with two observations.  First, in 2003, Robert filed an application for the mark "Zuppardi's Apizza, Inc." on behalf of Zuppardi's. (This application was later abandoned.)  Second, in 2008, Robert left the business and signed an agreement not to "interfere" with its operations.  In doing so, plaintiff argues, Robert impliedly consented to the registration of the marks Zuppardi's was then using.  I am not persuaded that Robert should be deemed to have consented on either ground.

With respect to the 2003 application, some cases hold that consent to one application for registration applies as well to later applications.  But in each of these cases, the consent of the individual identified in the mark resulted in a successful registration and a record of his consent.  The question was whether the person who owned the registered mark was later required to obtain consent for a second time when seeking to register another mark identifying the same person.  <u>See, e.g.,</u> <u>In re McKee Baking Co.</u>, 218 U.S.P.Q. 287, 287 (T.T.A.B. 1983) ("[I]nasmuch as there is a valid and subsising registration of the portrait, in fact two such registrations, which clearly state on their face that the required consent is of record, all

12

that is necessary to make the instant application complete is a claim of ownership of those prior registrations."). This case is distinguishable because the 2003 application never resulted in registration or a record of Robert's consent. Plaintiff points to no case law suggesting that Robert's 2003 filing qualifies as consent with respect to the 2010 registration, and I am aware of none. Thus, plaintiff has not shown consent on this ground.

I also think that consent should not be inferred from the 2008 agreement. It is one thing to permit another to use one's name as a mark, quite another to "relinquish all ownership rights in one's name and agree to allow another to register one's name." In re D.B. Kaplan Delicatessen, 225 U.S.P.Q. 342, 344 (T.T.A.B. 1985). Though Robert's agreement with the plaintiff might fairly be taken to imply consent to use of the marks in question, nothing in the contract suggests that Robert thereby ceded to the plaintiff all ownership rights in his name. See id. (finding consent to registration because the defendant, Donald Kaplan, "ha[d] indicated in writing that the trade name and service mark 'D.B. Kaplan Delicatessen' and any name or mark confusingly similar thereto is the property of D.B. Delicatessen, Inc., the applicant therein, and that Donald Kaplan cannot use it in any subsequent business"). I conclude,

13

therefore, that Robert did not consent to registration of the Zuppardi's marks.

4. Identification of Defendants in the Registered Marks

A person cannot oppose registration under § 1052(c) (or under § 35-11b(4)) merely because he shares the name used in the mark.  The statute's protection extends only to persons who would naturally be identified with a mark.  To that end, the Trademark Manual of Examining Procedure provides:

> A consent is required only if the individual bearing
> the name in the mark will be associated with the mark
> as used on the goods or services, either because: (1)
> the person is so well known that the public would
> reasonably assume a connection between the person and
> the goods or services; or (2) the individual is
> publicly connected with the business in which the mark
> is used.

TMEP § 1206.02 (5th ed. Sept. 2007).  The first test, called the "famous-person standard," protects those who might be falsely associated with a mark because they have achieved general fame or notoriety.  The second, the "publicly connected standard," concerns itself with persons who might be identified with a mark because members of the public associate them with the field in which the mark will be used.  The defendants focus on the latter, arguing that both Robert and Anthony III are so connected with the pizza trade that members of the public would naturally assume they are identified in the Zuppardi's marks.

14

Whether the defendants are "publicly connected with the business in which the mark is used" depends on what is meant by "publicly connected" and "the business in which the mark is used."  Plaintiff argues that the standard refers to the public at large and to a general trade or field; defendants argue that the standard is satisfied provided the people of West Haven associate either Robert or Anthony III with Zuppardi's Apizza.[3]  I think plaintiff has the better of the argument.

Though no case expressly holds that the "publicly connected" standard refers to national reputation and general field of business, the language of the cases and their results are consistent with that interpretation.  In Martin v. Carter Hawley Hale Stores, Inc., 206 U.S.P.Q. 931 (T.T.A.B. 1979), the Trademark Trial and Appeal Board dismissed an opposition because "no evidence ha[d] been offered to indicate that opposer enjoys a reputation of such fame or notoriety as to be *recognizable by the public at large* or that he is or ever was publicly connected or associated with *the clothing field*."  Martin, 206 U.S.P.Q. at 933 (emphasis added).  Similarly, in Ross v. Analytical Tech., Inc., 51 U.S.P.Q.2d 1269 (T.T.A.B. 1999), the Board stated that

---

[3] Plaintiff also argues that even Zuppardi's customers would not identify the marks with Robert or Anthony III, the more natural association being the patriarch Dominick.  The intensely factual inquiry is not properly resolved on a motion for summary judgment.

"the issue narrows down to whether *a public association* of opposer with *the field of electrochemical analysis remains*, so that he may invoke the provisions of Section 2(c)." Ross, 51 U.S.P.Q.2d at 1274 (emphasis added).

The plaintiff's best support comes from Krause v. Krause Publ'ns, Inc., 76 U.S.P.Q.2d 1904 (T.T.A.B. 2005). The petitioner in that case claimed to be publicly connected with a wide range of businesses, among them numismatics (the study or collection of currency) and the collecting of both cars and cutlery. The Board found that the petitioner, who had once been named the American Numismatics Association's Numismatist of the Year, was publicly connected with the fields of numismatics and car collecting. But he was not publicly connected with "the field of cutlery" because there was "no evidence that [he] ha[d] authored or lectured in the field or that he ha[d] made significant contributions to the field." Krause, 76 U.S.P.Q.2d at 1911. The analysis in Krause demonstrates the difficult showing required by § 1052(c).

Defendants argue that a "publicly connected" standard construed as the plaintiff urges merely repeats, and thereby renders superfluous, the "famous-person" test. In other words, any person with a truly national reputation within a certain field is by definition "so well known that the public would

16

reasonably assume a connection between the person and the goods or services." TMEP § 1206.02 (5th ed. Sept. 2007). I disagree. The first route to protection under § 1052(c) is to achieve general fame or notoriety. The second is to acquire a national reputation within a particular field. The set of persons who answer to the first description is not coextensive with the set of persons who answer to the second. An example is provided by the master numismatist in Krause. See Krause, 76 U.S.P.Q.2d at 1908 ("In the present case, the record fails to establish that petitioner is so well known by the public in general that a connection between petitioner and the mark KRAUSE PUBLICATIONS would be presumed. . . . [T]he fields of numismatics, car collecting, and publishing of hobby magazines are niche markets and there is insufficient evidence to establish that petitioner's activities in these fields are well known to the general public."). Under the law as applied in Krause, the "famous-person" and "publicly connected" standards retain independent meaning.

This interpretation of § 1052(c) settles the issue in favor of the plaintiff. The defendants do not argue that the public at large ever associated Robert or Anthony III with the general field of pizza-making. Nor does the record support such an argument. Accordingly, the plaintiff's motion for summary

judgment with regard to the defendants' counterclaims is granted.

## B. Defendants' Motions for Summary Judgment

The defendants argue that they are entitled to partial summary judgment on a number of issues for a variety of reasons. They assert that the doctrine of laches bars plaintiff's entire action, plaintiff cannot prove actual damages, plaintiff's registered marks should be cancelled, TZA acquired common-law rights in the "Tony Zuppardi's Apizza" mark in Vermont and Massachusetts, and plaintiff cannot recover attorneys' fees. Defendants also seek a judgment that they have not infringed plaintiff's federally registered trademarks on the ground that TZA closed its doors before the marks were registered.  Each argument is addressed in turn below.

## 1. Laches

The equitable defense of laches operates to bar suit by a plaintiff who sleeps on her legal rights.  In an action for trademark infringement, laches requires proof that the plaintiff had knowledge of defendant's use of its marks, that the plaintiff inexcusably delayed taking action, and that permitting the plaintiff to assert its rights would cause unfair prejudice to the defendant.  Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1040 (2d Cir. 1980).  Laches presumptively

applies if a plaintiff fails to sue within the applicable statute of limitations, Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996), which in this case is Connecticut's three-year statute for fraud actions, RBC Nice Bearings, Inc. v. Peer Bearing Co., 410 Fed. Appx. 362, 367 (2d Cir. 2010).  The defense of laches is equitable and as such will not protect the defendant who infringes a mark in bad faith. Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd., No. 06 Civ. 3508, 2007 WL 2914452, at *3 (2d Cir. 2007).

Defendants argue that plaintiff should have known about TZA's use of the "Tony Zuppardi's Apizza" mark by January 2006. Plaintiff has admitted that before that time, customers began to ask whether Zuppardi's had opened a location in Vermont.  ECF No. 97, Ex. O at 37-38.  TZA argues that if Zuppardi's had bothered to look into the matter, it would have learned that Anthony III was using the marks.  See RBC Nice Bearings, Inc., 410 Fed. Appx. at 365 (plaintiff resisting a laches defense is charged with knowledge of facts reasonable investigation would have revealed).  Plaintiff responds that a few stray questions from customers did not put it on inquiry notice of TZA's infringement, that the doctrine of "progressive encroachment" provided it a measure of latitude in determining when to defend its rights, and that the defendants cannot obtain equitable

relief because they infringed in bad faith.  I agree that genuine issues of material fact on this final point preclude summary judgment.

In the Second Circuit, a party who uses a mark knowing another is using it does not necessarily act in bad faith. Rather, "[i]n the trademark context, bad faith requires a showing that the junior user 'inten[ded] to promote confusion or exploit [the senior user's] good will or reputation.'" RBC Nice Bearings, Inc., 410 Fed. Appx. at 366 (quoting Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 388 (2d Cir. 2005)).  Defendants submit that no reasonable juror could infer that TZA acted with intent to confuse the public or exploit the plaintiff's reputation when it adopted the "Tony Zuppardi's Apizza" mark in Vermont.  However, they have not demonstrated that they are entitled to prevail on this point as a matter of law.

"Subjective issues such as good faith are singularly inappropriate for determination on summary judgment," American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 353 (2d Cir. 1981), and plaintiff has adduced sufficient evidence to raise a genuine dispute about whether Robert Zuppardi and TZA acted in good faith.  Robert's deposition testimony shows that he arranged to obtain TZA's pizza boxes and frozen pizza labels by calling the same printer who produced the plaintiff's

20

materials and asking the printer "to do me up a label like I
used to use for the frozen pizzas [made by Zuppardi's]." ECF
No. 90, Ex. 1 at 120-121. As a result, TZA's boxes and labels
were very similar to the ones used by Zuppardi's. Moreover,
Robert admitted during his deposition that he participated in
TZA's business by selling frozen pizzas to some of the same
Connecticut establishments that had previously ordered from
Zuppardi's. Id. at 75. Evidence in the record indicates that
in dealing with these establishments, Robert did not disclose
that he was no longer affiliated with Zuppardi's of West Haven.
ECF No. 90, Ex. 6 at 16. Finally, plaintiff has produced
evidence tending to show that Anthony III endeavored to inform
his Vermont customers of an association between TZA and
Zuppardi's. ECF No. 90-22, Ex. 21 (stating on a menu, "Tony has
dreamed of bringing Zuppardi's Apizza to the area.").

Viewing the evidence in a manner most favorable to the
plaintiff, as the Court must, a jury could infer that by
adopting the "Tony Zuppardi's Apizza" mark and trade dress,
defendants sought to exploit customer confusion and trade on the
plaintiff's goodwill. Thus, defendants' motion for summary
judgment on the ground of laches will be denied.

2. Lost Profits

A plaintiff who makes out a claim of trademark infringement is not necessarily entitled to a damages award.  Liability for infringement is premised on the likelihood of confusion, but likelihood of confusion does not by itself support an award of damages.[4]  Instead, a plaintiff seeking damages for infringement must show the amount of profits it lost due to customer confusion so that the damages award is not too speculative.[5] Victoria Cruises v. Changjiang Cruise Overseas, 630 F. Supp. 2d 255, 261-62 (E.D.N.Y. 2008).

Plaintiff alleges that when TZA began to do business in Connecticut, seven establishments that had formerly purchased its frozen pizzas started ordering them from TZA instead.  ECF No. 90-27 at 3.[6]  According to the plaintiff, its sales to these

---

[4] The same principle applies to the plaintiff's common law and CUTPA claims.  The question of lost profit damages is therefore addressed the same way with respect to each count.  See Nabisco Brands, Inc. v. Kaye, 760 F. Supp. 25, 29 (D. Conn. 1991); Engdall v. Wadsworth, No. 4103913, 2007 WL 2756968, at *4 n.3 (Conn. Super. 2007) ("Since the Model Bill is patterned after the Lanham Act, it is appropriate for a court in interpreting . . . state law to rely upon federal case law interpreting the Lanham Act.") (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. § 22:7)).

[5] Section 35 of the Lanham Act, 15 U.S.C. § 1117, also permits a prevailing party to recover "profits acquired by the defendant through its infringing use," costs, and "in exceptional cases, reasonable attorneys' fees."  The question of attorneys' fees is addressed below.  The plaintiff's theory of damages premised on TZA's profits was precluded by this Court in ECF No. 137.

[6] The establishments (all restaurants or bars in southern Connecticut) are Michael's Café, Mama Dells, Lake View, Stonehouse, Country Tavern, Sheppards, and Pete's Place.

customers ceased entirely around 2007, entitling it to the profits it would have made on the accounts between 2007 and 2010 if it had not lost them to TZA.  The defendants argue that plaintiff has not adequately proven lost profits with respect to any of the seven accounts.  I agree.

a. Actual Confusion

A plaintiff seeking damages for trademark infringement ordinarily must prove actual confusion.  Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996).[7]  This case is no exception.  To survive the defendants' motion, then, plaintiff must produce evidence sufficient to permit the inference that the customers who switched to TZA were confused about the source of their frozen pizzas.

Plaintiff has carried this burden with regard to one customer but not the others.  Plaintiff offers three pieces of evidence to show that its former customers were actually confused by TZA's use of the "Tony Zuppardi's Apizza" mark.  The first is that TZA's boxes and labels were almost identical to the ones used by Zuppardi's.  ECF No. 90-1 at 28.  The second is

---

[7] Some Second Circuit precedent stands for the proposition that proof of a defendant's intentionally deceptive conduct creates a rebuttable presumption of actual confusion.  See, e.g., Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 493 (2d Cir. 1998).  Plaintiff does not make this argument and relies instead on proof of actual confusion.

Robert Zuppardi's admission that he did not personally notify TZA's customers that he no longer worked for Zuppardi's.  Id. The third concerns testimony from an owner of Country Tavern, William Richards O'Neill, indicating that he was unsure about the relationship between TZA and Zuppardi's at the time he was ordering frozen pizzas from TZA.  ECF No. 90 at 22-24.

The first two items of evidence, which relate to likelihood of confusion, do not prove actual confusion.  In a trademark infringement case, the basic distinction between the proof required for liability and the proof required for damages is that the latter demands a showing of actual confusion.  The similarity of the marks and Robert's admission do not prove that any of the customers who switched to TXA were actually misled.

The evidence of O'Neill's confusion requires further analysis.  In his deposition O'Neill stated that when he began working at Country Tavern in 2009, a company called "Zuppardi's" supplied the restaurant with frozen pizzas.  ECF No. 90, Ex. 6 at 14.  O'Neill regularly took telephone calls from a person who would say, "Hi this is Tony, wondering if you have a pizza order."  Id. at 15.  At the time he "didn't know one way or the other" whether the "Tony" from whom he was ordering frozen pizzas was affiliated with Zuppardi's of West Haven.  Id. at 16. He did know, however, that his pizzas were coming from Vermont

24

and not Connecticut.  The calls from "Tony" ceased abruptly when TZA stopped doing business in 2010.  At that time O'Neill placed a call to Zuppardi's in West Haven to "inquire[] if that Zuppardi's Pizzeria did a frozen pizza."  ECF No. 101-12, Ex. L at 54.

According to the plaintiff, O'Neill's deposition testimony shows that he was confused about the relationship between TZA and Zuppardi's when he was placing orders with TZA.  It characterizes O'Neill's phone call to Zuppardi's as an inquiry into why the calls from "Tony" had stopped and reasons that he would not have contacted Zuppardi's with this question unless he had thought that "Tony" and Zuppardi's were connected.  The defendants counter that O'Neill knew all along that his pizzas were coming from Vermont and that he contacted Zuppardi's merely to find a new source of frozen pizza after TZA stopped calling.

On this record, whether O'Neill was confused about the source of his pizzas cannot be resolved as a matter of law.  The purpose of his phone call to Zuppardi's bears heavily on the issue of his confusion, and there is a genuine dispute about why he placed the call.  Viewing the evidence in a manner most favorable to the plaintiff, a jury could reasonably infer that O'Neill called to find a new vendor.  But it could also infer

that he called because he wanted to know why Zuppardi's had stopped soliciting his pizza orders.

Though the evidence permits an inference of actual confusion on the part of O'Neill, it does not support such an inference as to any of the other accounts.  O'Neill was the purchasing agent only for Country Tavern.  With respect to the six other accounts, plaintiff has offered no evidence of actual confusion.  Even if a jury found that O'Neill was confused about the relationship between TZA and Zuppardi's, it could not reasonably infer that purchasing agents at the other establishments, about whom Zuppardi's offers no information at all, were similarly misled.  See Savin Corp. v. Savin Group, 391 F.3d 439, 459 (2d Cir. 2004) ("A single 'anecdote[] of confusion over the entire course of competition,' however, 'constitute[s] de minimis evidence insufficient to raise triable issues.'") (quoting Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001)).[8]

---

[8] The record evidence offered by the defendants points in the opposite direction.  The plaintiff's Rule 30(b)(6) witness testified that Stone House was not confused about the source of its pizzas.  ECF No. 101-15, Ex. O at 172.  A report offered by the defendants (the admissibility of which is unchallenged by Zuppardi's) indicates that Lake View and Sheppards ordered pizzas from Robert knowing that he had left Zuppardi's.  ECF No. 101-7, Ex. G at 2.  Finally, the plaintiff admits that it never did business with Pete's Place.  ECF No. 90-1 at ¶ 75.

In sum, the evidence regarding O'Neill's alleged confusion presents a triable issue.  However, the lack of evidence of actual confusion as to the other accounts entitles the defendants to summary judgment on plaintiff's claim for lost profits with regard to those accounts.

c. Proof of Lost Profits

A plaintiff seeking lost profits in a trademark infringement case must prove the amount of the loss.  The amount of loss is "calculated by estimating the revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue." Victoria Cruises, 630 F. Supp. 2d at 262.  This requires the plaintiff to establish a "pre-infringement 'base line' . . . to predict what revenue plaintiff would have generated absent the infringement." Id.  Such proof generally takes the form of an account of sales over some period of years before the alleged infringement began.  See Lindy Pen Co. v. Bic Pen Corp., 14 U.S.P.Q.2d 1528, 1532 (C.D. Cal. 1989) (denying the plaintiff's damages claim because it failed to establish an adequate sales baseline).  A plaintiff need not prove lost profits with precision, but must identify "an evidentiary basis on which to rest such an award." Vuitton Et Fils S.A. v. Crown Handbags, 492 F. Supp. 1071, 1077 (S.D.N.Y. 1979), aff'd mem., 622 F.2d 577 (2d Cir. 1980).

27

There is no sound basis in the summary judgment record in this case to support an award of lost profits. Plaintiff has arguably carried its burden of establishing a pre-infringement sales baseline by providing Cheryl Zuppardi Pearce's "best estimate" of its monthly sales on the seven accounts prior to TZA's alleged infringement. See ECF No. 90-25, Ex. 24 at 6; ECF No. 90-27, Ex. 28 at 4. But plaintiff is not entitled to recover for lost sales; it is entitled to recover lost profits. On this record, a jury would have to engage in speculation in order to make such an award.

Plaintiff seems to implicitly concede that it is unable to establish lost profits with satisfactory proof. It explains its predicament by pointing out that Robert Zuppardi was responsible for keeping its books between 2003 and 2005. ECF No. 90 at 26. Plaintiff offers no authority to support the proposition that Robert's performance while still an agent of Zuppardi's should relieve it of its burden to produce evidence supporting its damages claim. In the absence of such authority, plaintiff's inability to adduce sufficient evidence of lost profits provides a final ground on which to grant defendants' motion for summary judgment. Plaintiff has not shown that it is entitled to recover the profits it claims to have lost even with regard to Country Tavern.

3. <u>Cancellation Under 15 U.S.C. § 1052(c)</u>

     For reasons discussed above, plaintiff is entitled to
summary judgment on defendants' cancellation counterclaims. For
those same reasons, defendants' motion for summary judgment on
the counterclaims is denied.

4. <u>TZA's Common-Law Rights in Massachusetts and Vermont</u>

     Defendants next argue that summary judgment should enter on
TZA's common law rights in the "Tony Zuppardi's Apizza" mark in
Massachusetts and Vermont.  TZA's argument rests on the <u>Tea Rose
- Rectanus</u> doctrine, which holds that federal registration of a
mark does not impair the preexisting common law rights of junior
users.  Under <u>Tea Rose - Rectanus</u>, plaintiff holds its
registered marks subject to the rights TZA acquired prior to
plaintiff's federal filing if TZA used the marks in
geographically remote areas and in good faith.  <u>Tuccillo v.
Geisha NYC, LLC</u>, 635 F. Supp. 2d 227, 245 (E.D.N.Y. 2009).[9]

     Plaintiff offers no argument that at the time TZA began to
use the marks in question, Massachusetts and Vermont were not
remote areas.  (Remoteness, under <u>Tea Rose -Rectanus</u>, is a
question not of geographic distance but of a mark's strength.
If the senior user's mark has not achieved secondary meaning in

---

[9] It is undisputed that TZA was using the "Tony Zuppardi's Apizza"
mark in Massachusetts and Vermont before Zuppardi's filed on
June 23, 2009.

the area where the junior user operates, the area is remote.
McCarthy, McCarthy on Trademarks § 26:25.)  But it does contend
that TZA acted in bad faith.  Defendants respond that TZA did
not act in bad faith when it used the "Tony Zuppardi's Apizza"
mark in a remote area, for in Massachusetts and Vermont there
were no Zuppardi's customers to confuse and no Zuppardi's
goodwill to exploit.

Defendants' argument tends to write the good faith
requirement out of the Tea Rose - Rectanus test.  Because the
doctrine defines remoteness according to the unlikelihood of
confusion, no junior user in a remote area can act in bad faith
as long as bad faith requires the intent to confuse.  That
holds, anyway, if the lack of intent to confuse can be inferred
from the unlikelihood of confusion – an inference the defendants
urge.  See ECF No. 97 at 33 ("Further, Tony Zuppardi
indisputably adopted such mark and initiated its use in
Wilmington, Vermont which was geographically remote with respect
to Plaintiff's pizzeria . . . . Tony Zuppardi therefore
indisputably adopted his mark in good faith.").)  I decline to
collapse the two prongs of Tea Rose -Rectanus into one, which
other courts in the Second Circuit also have declined to do.
See Tuccillo, 635 F. Supp. 2d at 246-47 ("Because the Court has
made the factual finding that Tuccillo was *aware* of Geisha's use

of the mark when he copied it, he did not have the requisite good faith when he adopted the mark . . . ."). If good faith is defined as lack of knowledge of the senior user's mark, TZA admittedly did not act in good faith.

Moreover, even assuming bad faith requires a showing of intent to confuse or exploit, genuine factual disputes preclude summary judgment on this point. As discussed above, a jury could reasonably find that TZA set out to exploit the plaintiff's goodwill. TZA reached into Connecticut to do business with plaintiff's former customers and did so using very similar marks and trade dress. ECF No. 90, Ex. 1 at 120-21. Its dealings in Vermont and Massachusetts, viewed most favorably to plaintiff, are consistent with an intent to capitalize on the Zuppardi's name. TZA's Wilmington menu proclaimed Tony's "dream[] of bringing Zuppardi's Apizza to the area," and after Robert left Zuppardi's he told his Vermont distributor that he had a restaurant in West Haven. ECF No. 90-22, Ex. 21; ECF No. 90-8, Ex. 7 at 69-70. This evidence supports an inference of bad faith as the defendants define the phrase. Other evidence, including the unlikelihood that Vermont or Massachusetts customers would have known of Zuppardi's of West Haven, points in the other direction. The question is for a jury, not the Court. Defendants' motion for summary judgment concerning TZA's

31

common law rights in Massachusetts and Vermont is therefore denied.

5. Attorneys' Fees

Defendants next argue that they are entitled to summary judgment concerning plaintiff's claim for attorneys' fees. Plaintiff seeks fees on its Lanham Act and CUTPA claims.[10]  Fees are not available for its claims under the common law.[11] Bernhard-Thomas Bldg. Sys., LLC v. Weitz Co., LLC, 2011 U.S. Dist. LEXIS 125924, at *9 (D. Conn. Oct. 31, 2011).

Section 35 of the Lanham Act permits an award of attorneys' fees to the prevailing party in "exceptional" cases.  15 U.S.C. § 1117(a).  In the Second Circuit, a case is "exceptional" and a fee award proper if the prevailing party proves "fraud or bad faith."  Conopco, Inc., 95 F.3d at 194 (quoting Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1383 (2d Cir. 1993)).  Exceptionality is a necessary condition for a fee award, but it is not always sufficient.  An award of fees

---

[10] The claims are, again, assessed under the same standard. Engdall, 2007 WL 2756968, at *4 n.3.

[11] The plaintiff also seeks fees for the proceeding before the PTO.  This claim finds no support in law.  CUTPA does not authorize fees based a fraudulent submission to the PTO.  The Argus Research Group, Inc. v. Argus Media, Inc., 562 F. Supp. 2d 260, 279 n.9 (D. Conn. 2008).  As for the Lanham Act claims, the inability of a claimant to petition the PTO for fees, see 37 C.F.R. § 2.127(f), strongly suggests that litigants should not be able to obtain them in a roundabout manner by using a different federal law.

rests in the court's discretion in any case.  <u>Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.</u>, 915 F. Supp. 2d 1179, 1186 (D. Nev. 2013).  In determining whether to grant fees, the court may consider a host of non-exclusive factors, including "the nature and extent of the relief obtained, the unlawfulness of each defendant's conduct, whether the relevant area of law is unclear, whether infringement or willfulness was a close question, whether each defendant intended to deceive or confuse the public . . . whether the plaintiff suffered actual damage," and the culpability of the defendant's behavior.  <u>Id</u>.

On this record, issues of fact germane to the fees inquiry remain to be settled.  Most prominent among these is the threshold question of the case's exceptional nature.  But even if these factual disputes were settled in the plaintiff's favor, this Court would in its discretion decline to award fees.

As just mentioned, courts determining whether to award attorneys' fees can look to the culpability of the alleged infringer's conduct.  This is so even if the threshold showing of bad faith has been made.  Courts have decided against awarding fees in cases involving defendants who acted with a great deal more culpability than Robert or Anthony III.  In <u>Fifty-Six Hope Road</u>, for instance, one defendant continued to infringe the plaintiff's trademark even after the plaintiff

advised him of the violation and sent him a cease-and-desist letter. Id. Yet the court determined that it would be improper to charge the defendant with the plaintiff's legal fees. Id. Here, there is no evidence to indicate that TZA continued in its course of conduct after learning about the plaintiff's objections. In fact, the opposite is true. TZA voluntarily surrendered its registered mark after Zuppardi's initiated a cancellation proceeding and it stopped doing business soon after Zuppardi's filed this lawsuit.

The close nature of the legal issues presented by this case also weighs heavily against an award of attorneys' fees. With regard to the issue of bad faith, plaintiff has presented evidence showing that TZA adopted a mark similar to its own and used that mark in Connecticut, but TZA has countered with evidence that Robert did so owing more to inertia than to an intent to deceive anyone. Similarly, plaintiff has shown that Robert solicited frozen pizza orders from its former customers, but the defendants have adduced evidence tending to demonstrate that Robert attracted these customers by appealing to old loyalties instead of by sowing confusion. Moreover, TZA did the lion's share of its business in Massachusetts and Vermont, where, the parties agree, Zuppardi's was not well-known. The question of bad faith affects several of the legal inquiries in

34

this case, among them the issue of infringement (as well as the question of the availability *vel non* of attorneys' fees).  On this record a jury might find bad faith.  But it might find otherwise and do so with eminent reasonableness.  The closeness of this question, relevant on several doctrinal fronts, augurs against a fee award.

Another factor weighing against an award of attorneys' fees is plaintiff's inability to recover significant relief.  As discussed above, plaintiff has not provided sufficient evidence to support an award of lost profits.  Plaintiff also seeks to enjoin TZA from using its marks, but TZA has not done business since 2010.

In light of these considerations, even if a jury were to find that TZA acted in bad faith, I would decline to award attorneys' fees.  Accordingly, the defendants' motion for summary judgment with regard to attorneys' fees will be granted.

6.  Infringement of the Federally Registered Marks

Count four of the amended complaint alleges that TZA infringed plaintiff's federally registered marks, U.S. Trademark Registration Nos. 3888782 and 3888558, and seeks relief under 15 U.S.C. § 1114.  Plaintiff obtained these registrations in December 2010.  Plaintiff admits that TZA discontinued its use of the "Tony Zuppardi's Apizza" mark in October 2010.  ECF No.

102-1 at ¶ 48.  Noting that a party cannot infringe a federally
registered mark until it is registered, TZA argues that
plaintiff cannot obtain relief under § 1114.  Plaintiff counters
that even if TZA has not infringed its registered marks, it is
likely to do so in the future.  Citing Polo Fashions, Inc. v.
Dick Bruhn, et al., 793 F.2d 1132 (9th Cir. 1986), it argues
that "future infringement of a registered trademark . . . [is]
actionable and remedied by injunctive relief."  ECF No. 162 at
4.

    In Polo Fashions, there was no dispute that the defendant
had infringed the plaintiff's registered mark in violation of §
1114.  See Polo Fashions, 793 F.2d at 1135 ("The defendants had
willfully violated Polo's trademark rights.").  The question was
whether the defendant's cessation of unlawful conduct precluded
injunctive relief, and it was on this point that the court held
that the possibility of future infringement warranted an
equitable remedy.  In this case, the precondition of
infringement is absent.  A plaintiff has no cause of action
under § 1114 until the defendant "use[s]" its registered mark in
commerce, and there is no evidence that TZA has so used the
plaintiff's registered marks.  See 15 U.S.C. § 1114(a).  Without
a cause of action, plaintiff is entitled to no relief,

injunctive or otherwise.   Thus, summary judgment will enter on count four.

C. The Plaintiff's Motion for Summary Judgment on Trademark Infringement

To prevail on its claims under section 43 of the Lanham Act, CUTPA and the common law, plaintiff has to show that "it has a valid mark entitled to protection and that defendant's use of it is likely to cause confusion." Gruner + Jahr USA Pub. v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993); Nabisco Brands, Inc., 760 F. Supp. at 29.   There appears to be no dispute that the Zuppardi's marks are valid.   As personal names, the marks are descriptive, and therefore not protected absent a showing of secondary meaning.   McCarthy, McCarthy on Trademarks § 13:2.   Plaintiff has demonstrated secondary meaning, at least in the area close to its West Haven location.   See Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 344 (E.D.N.Y. 2007); ECF No. 102, Exs. 3 at 92, 15, & 22. Defendants apparently concede this point.

The issue is whether on the undisputed facts, this Court can say as a matter of law that TZA's use of the plaintiff's mark was likely to cause confusion.   This inquiry is governed by the eight-factor test set out in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961).   Under the Polaroid test, a court must consider "the strength of [the senior user's]

mark, the degree of similarity between the two marks, the proximity of the products, the likelihood the prior owner will bridge the gap, actual confusion . . . defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers."[12]  Polaroid Corp., 287 F.2d at 495.  Review of these eight factors is not mechanical, and a plaintiff may prevail without proving all or even most of them. Among the eight, the first three – the strength of the mark, the similarity of the marks, and the proximity of the products – are usually the most important.  Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987).

I think plaintiff has demonstrated that the marks are confusingly similar.  However, analysis of the Polaroid factors requires resolution of factual issues that cannot be determined as a matter of law on the present record.  Accordingly, plaintiff's motion will be denied.[13]

1. The Strength of the Zuppardi's Marks

---

[12] The parties do not address the quality of TZA's product, and they agree that the question of TZA's "bridging the gap" (that is, the likelihood it will expand its operation to compete with Zuppardi's) is inapplicable on this record.
[13] Defendants' filing on infringement is styled as an opposition to  plaintiff's motion, not a cross-motion for summary judgment. But it argues that the undisputed facts show that it did not infringe the plaintiff's marks as a matter of law.  Factual disputes defeat that argument, just as they defeat the plaintiff's.

A mark's strength is its "tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir. 1979).  When a mark is descriptive, as in this case, its strength depends on the reach and degree of its secondary meaning.  Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 132 (2d Cir. 2004).[14] Secondary meaning must be assessed within the relevant market, which for a restaurant such as Zuppardi's is its "pool of actual and potential customers."  Id.  Courts assessing the existence of secondary meaning typically consider the senior user's advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize the mark and the length and exclusivity of the mark's use.  Jewish Sephardic Yellow Pages, 478 F. Supp. 2d at 344.  These factors should be assessed with an eye toward the ultimate inquiry: whether, for actual and potential customers across southern Connecticut, the Zuppardi's marks chiefly signify a producer rather than a

---

[14] Plaintiff argues that its marks are arbitrary, not descriptive. (An arbitrary mark is inherently distinctive and stronger than a descriptive mark because it makes "no reference to the nature of the goods it designates." Virgin Enterprises, Ltd. v. Nawab, 335 F.3d 141, 148 (2d Cir. 2003).  The law does not support the plaintiff's position.  McCarthy, McCarthy on Trademarks § 13:2 ("Personal names are placed by the common law into that category of noninherently distinctive terms which require proof of secondary meaning for protection."); see also Abraham Zion Corp. v. Lebow, 761 F.2d 93, 104 (2d Cir. 1985) (same).

product.  See Centaur Commc'ns v. A/S/M Commc'ns, 830 F.2d 1217, 1221 (2d Cir. 1987).

The record supports the conclusion that the plaintiff's marks were strong in the area close to its Union Avenue storefront.  The defendants admit as much.  ECF No. 153 at 2. But TZA sold mostly to establishments located at some remove from West Haven, and those establishments presumably drew many of their customers from towns other than West Haven.  This case therefore requires a determination of whether the plaintiff's marks were strong across a wider swath of southern Connecticut.

The parties have submitted a great deal of evidence relevant to this inquiry.  Some of the evidence conflicts, and even the undisputed facts permit a range of inferences.  For instance, plaintiff offers deposition testimony indicating that Zuppardi's advertised on the Internet and in local magazines. ECF No. 102-2, Ex. 3 at 92-93.  Defendants counter with testimony from the same witness suggesting that Zuppardi's relies almost entirely on word of mouth to bring in business because Anthony Zuppardi Jr. disliked print advertising.  ECF No. 153, Ex. C at 96.  Plaintiff emphasizes that it enjoyed unsolicited coverage in Connecticut Magazine when it received an award for its food.  ECF No. 102-2, Ex. 3 at 93.  Defendants respond that no evidence of consumer studies links that coverage

to public awareness about Zuppardi's.  Plaintiff argues that
TZA's copying of its mark is the sort of plagiarism that
indicates secondary meaning.  Defendants admit the copying but
assert that Robert adopted the mark for the sake of ease alone.
Plaintiff asserts that the sale of frozen pizzas to
establishments along the Connecticut coast extended the reach of
its name.  Defendants respond that, because those establishments
removed the labels from frozen pizzas before serving them, there
is no evidence that frozen pizza sales exposed the public to the
Zuppardi's marks.  ECF No. 153 at 23.

There is no reason to provide a longer list of the disputed
facts and competing inferences presented by the record.  The
strength of the Zuppardi's marks depends on what they signify in
the minds of Connecticut residents, and the evidence permits a
range of reasonable determinations and inferences on this score.
When "there are factual disputes with respect to some of the
factors . . . and a finding of secondary meaning can only be
made by a careful consideration of all six factors, with no
single factor being determinative, the question cannot be
decided as a matter of law, but is properly to be decided by a
jury."  New Colt Holding Corp. v. RJG Holdings of Florida, Inc.,
312 F. Supp. 2d 195, 209 (D. Conn. 2004).  Only by resolving
factual disputes and rejecting reasonable inferences can I find

41

that the plaintiff's marks were strong in the relevant market, and the question is therefore not well-suited for resolution on summary judgment.

## 2. The Degree of Similarity Between the Two Marks

The marks, which are reproduced in the Appendix, are essentially identical in sound, meaning, and appearance.  See Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570 (Fed. Cir. 1983).  The chief difference between the labels used by plaintiff and the labels used by TZA is TZA's insertion of the word "Tony" over the northwest corner of "Zuppardi's." The defendants argue that this differentiates the two, but the essential similarity of the marks far outweighs this distinction.  See Edison Bros. Stores, Inc. v. Cosmair, Inc., 651 F. Supp. 1547, 1555 (S.D.N.Y. 1987).  That TZA's design incorporates the plaintiff's design in its entirety further supports the conclusion that the marks are quite similar.  See, e.g., Girls Clubs of America, Inc. v. Boys Clubs of America, Inc., 683 F. Supp. 50, 53 (S.D.N.Y. 1988).  This factor favors the plaintiff.

## 3. Proximity of the Products

This factor "concerns whether and to what extent the two products compete with each other."  Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996).  The plaintiff

points out that both parties dealt in frozen pizza in Connecticut and argues that this clinches this factor in its favor. But the question is not so simple. Analysis of product proximity requires inquiry into "the nature of the products themselves and the structure of the relevant market," Vitarroz v. Borden, Inc., 644 F.2d 960, 967 (2d Cir. 1981), and the market's structure depends on such factors as "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold," Cadbury Beverages, Inc., 73 F.3d at 480. Appropriately subtle treatment of this factor calls for the Court to consider the types of consumers who bought the parties' frozen pizzas and the circumstances of their purchases.

With that in mind, I conclude that questions of fact preclude a determination that this factor favors the plaintiff. To be sure, plaintiff has adduced evidence showing that TZA sold frozen pizzas to bars and restaurants in southern Connecticut, just as plaintiff has done for years. But defendants' evidence shows that some of the purchasing agents at these establishments knew Robert Zuppardi well and were aware that he had stopped working at Zuppardi's. ECF No. 101-7, Ex. G. To the extent that purchasing agents knew about Robert's shift in allegiance, it cannot be said that Zuppardi's and TZA sold their goods

43

through the same channels: it would have been obvious to these buyers that Robert was not selling as a representative of Zuppardi's.  See Cadbury Beverages, Inc., 73 F.3d at 480. Moreover, the parties dispute whether a customer who ordered a frozen pizza at one of these establishments would ever have had occasion to view the pizza's label or otherwise learn about its origin.  See, e.g., id. at 480-81 (holding that the question of proximity could not be resolved on summary judgment because of fact questions about whether end-user customers regularly viewed the defendant's logo when they purchased its product).  The question of proximity is properly resolved by a jury.

## 4. Actual Confusion and Good Faith

For reasons previously discussed, issues of fact preclude a determination with regard to these factors.

## 5. Sophistication of the Buyers

The more sophisticated a purchaser, the less likely she is to be confused by the similarities between two competing products.  Cadbury Beverages, Inc., 73 F.3d at 480.  The parties address this factor only in passing, but it merits brief consideration.  Nothing indicates that the consumers of Zuppardi's fresh or frozen pizzas were overly sophisticated buyers, but the parties dispute whether people who ordered frozen pizzas ever saw their labels.  As for the establishments

44

that purchased frozen pies for resale, common sense suggests a level of expertise beyond that of the end consumer. More importantly, though, those purchasers who knew about Robert's departure from Zuppardi's should be considered quite sophisticated, because their knowledge about personnel changes on the part of other market participants would have made it clear that TZA and Zuppardi's were distinct entities. As has been discussed, I decline to resolve the factual dispute on this point.

III. <u>Conclusion</u>

Accordingly, it is hereby ordered:

-Plaintiff's motion for summary judgment on defendants' counterclaims, ECF No. 94, is granted.

-Defendants' motion for summary judgment, ECF No. 96, is granted on the issues of lost profits and attorneys' fees and denied on the issues of laches, cancellation of the plaintiff's registered marks, and TZA's common law rights in Massachusetts and Vermont.

-Plaintiff's motion for summary judgment on infringement, ECF No. 102, is denied.

-Defendants' motion for partial summary judgment as to Count Four, ECF No. 158, is granted.

So ordered this 29th day of September 2014.

_____/s/_____

Robert N. Chatigny
United States District Judge

APPENDIX

PLAINTIFF                          DEFENDANTS

Pizza Box Labels

 

Frozen Pizza Labels

 

Marks

